## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

Employers Reinsurance Corporation, )
)
                    Plaintiff, )
)
v. )
)    Case No. 06-0188-CV-W-FJG
Massachusetts Mutual Life )
Insurance Company, )
)
               Defendant. )

## ORDER

On July 22, 2008, the Court held a summary judgment hearing in this matter in order to resolve the issues of whether ERC is required to follow-the-settlements of Mass Mutual, and whether ERC has breached the Treaty's offset provision. The Court has now reached a determination of these issues. Pending before the Court is Defendant's Motion in Limine to Preclude Certain Testimony at the Hearing (Doc. No. 297); Plaintiff's Motion to strike Defendant's Pre-Hearing Brief (Doc. No. 299); Plaintiff's Motion to Strike Defendant's Motion in Limine (Doc. No. 300); Defendant's Motion to Strike Portions of Plaintiff's Brief (Doc. No. 307); and Defendant's Amended Motion to Strike Portions of Plaintiff's Brief (Doc. No. 308). Additionally, the Court previously denied the following motions pending the hearing on the summary judgment motions: Defendant's Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment on Count I of its Counterclaim (Doc. No. 188); Employers Reinsurance Corporation's Motion for Partial Summary Judgment (Doc. No. 191); Defendant's Motion for Summary Judgment Based Upon Limitations/Waiver/Estoppel/Latches on Plaintiff's Complaint (Doc. No. 193); and Massachusetts Mutual Insurance Company's Motion for Partial Summary Judgment (Doc.

No. 202).  The Court will address these motions below.

## I.    BACKGROUND[1]

This is a breach of contract action brought by a reinsurer, Employers Reinsurance Corporation ("ERC"), against its reinsured, Massachusetts Mutual Life Insurance Company ("Mass Mutual") for allegedly mishandling a wide number of claims under the parties' contract.  ERC brought forth the following claims:  Count I–Declaratory Judgment; Count II–Breach of Contract; Count III–Breach of Implied Duty of Good Faith; and Count IV–Accounting.  In its declaratory judgment claim, ERC seeks a declaration from the Court that Mass Mutual's past conduct constitutes a breach of contract and that ERC has no obligation under the Treaty to follow Mass Mutual's settlement actions.  Mass Mutual seeks summary judgment on all of ERC's claims.  ERC seeks summary judgment on Count I of its claim.

Mass Mutual brought forth the following counterclaims against ERC: Count I–Breach of Contract; Count IV–Breach of Implied Duty of Good Faith and Fair Dealing; Count VI–Declaratory Judgment; and Count VII–Connecticut Unfair Trade Practices Act.[2]  Mass Mutual also seeks declaratory relief and requests that this Court enjoin ERC from withholding reimbursements for covered claims under the Treaty.  Mass Mutual seeks summary judgment on Count I and Count VI of its counterclaim.  ERC seeks summary

---

[1]In accordance with Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party."  See Ruby v. Springfield R-12 Public School Dist., 76 F.3d 909, 911 n. 6 (8th Cir. 1996).  Accordingly, all facts set forth in the Court's statement of facts will be taken from plaintiff's motion for summary judgment (Doc. No. 191) and plaintiff's suggestions in support (Doc. No. 192) unless otherwise specified.

[2]The Court previously dismissed Count II, III, and V of defendant's counterclaims in its April, 2, 2007 Order (Doc. No. 73).

2

judgment on Count VII of Mass Mutual's counterclaim.

In August 1993, ERC and Connecticut Mutual Life Insurance Company ("CML") entered into the Excess Disability Income Reinsurance Agreement (the "Treaty") with an effective date of January 1, 1993. ERC drafted the language of the Treaty. Under the terms of the Treaty, ERC agreed, in exchange for a portion of the premium CML received, to indemnify CML for a portion of losses CML incurred on individual disability income policies issued prior to or during the period of January 1, 1993 through December 31, 1995. (Complaint, ¶ 16). ERC's liability for Covered Claims was triggered after a specific retention period during which CML bore all risk of loss on the Reinsured Policies. (Complaint, ¶18). Specifically, CML retained liability for 100% of the losses during the first 24 months of Covered Claims. (Complaint, ¶18). In other words, CML was liable for all benefits paid under the terms of the Reinsured Policies during the first two years of a claim. (Complaint, ¶18). After the two-year retention period, ERC was obligated to reimburse CML for 90% of the losses on all Covered Claims; CML retained 10% of the losses after the two-year retention period.

In February of 1996, CML merged into Mass Mutual and Mass Mutual assumed the rights and obligations of CML under the Treaty. The Treaty applies to "loss sustained by the Reinsured under the disability income policies described in the Schedule in force on the effective dates of [the Treaty] and issued by the Reinsured to become effective while [the Treaty] remains in force...as a result of disabilities commencing on or after the effective date and prior to the termination date of [the Treaty]." The Treaty is an "excess" reinsurance agreement insofar as the reinsured retains all of the liability for losses incurred in the first two years following each disability; the reinsurance treaty applies only to losses extending beyond, or in excess of, two years.

Case 4:06-cv-00188-FJG   Document 310   Filed 08/19/08   Page 3 of 21

Article IX of the Treaty provides:

> CLAIMS. The Reinsured agrees that it will cause to be investigated, paid, settled, or defended all claims arising under the policies and that it will give prompt notice to the Corporation of any event or development which, in the judgment of the Reinsured, might result in a claim upon the Corporation hereunder, and will forward promptly to the Corporation copies of such claim documentation as may be requested by the Corporation.
>
> The Corporation shall reimburse the Reinsured or its legal representative promptly for loss against which indemnity is herein provided, upon receipt in the home office of the Corporation of satisfactory evidence of payment of such loss.
>
> The Corporation shall have the right, at its own expense, to participate jointly with the Reinsured in the investigation, adjustment or defense of any claim which, in the judgment of the Corporation, it is or might become exposed.

Article IX of the Treaty also provides that "[ERC] shall have the right, at its own expense, to participate jointly with the Reinsured in the investigation, adjustment or defense of any claim which, in the judgment of the Corporation, it is or might become exposed."

Other relevant provisions of the Treaty include the following:

- Article IV of the Treaty defines loss as "only such amounts as are actually paid by the Reinsured for disability benefits afforded under the policies, in settlement of claims for disability benefits under the policies, or in satisfaction of judgments for disability benefits under the policies. The word "loss" includes the amount of premium currently waived under the policies."

- Article XV of the Treaty provides that "[t]his contract represents the entire contract between the parties hereto. No other agreements or contracts relating to the policies currently exist or are contemplated between the parties."

- Article XII of the Treaty provides as follows: "OFFSET. The ...Corporation may offset any balance, whether on account of premiums, commissions, loss or claim expenses due from one party to the other under this agreement or under any other reinsurance agreement heretofore or hereafter entered into between the Reinsured and the Corporation, whether acting as assuming reinsurer or ceding company."

As early as 1997 or 1998, ERC raised concerns regarding Mass Mutual's claims adjudication and its alleged failure to allow ERC to participate jointly in the investigation, adjustment and defense of claims. ERC proposed engaging Disability Management

4

Services ("DMS"), a third party administrator, to review reinsured claims on ERC's behalf, and provide recommendations and assistance to Mass Mutual. Mass Mutual had some reservations about using DMS. In March 1999, the parties entered into the 1999 Pilot Project ("Pilot"). The Pilot lasted six months and Mass Mutual did not extend the agreement. In 2001, ERC again approached Mass Mutual with its concerns and a proposal to engage DMS for a long-term engagement. Mass Mutual rejected ERC's proposal. However, Mass Mutual eventually agreed to ERC's proposal and in January 2002, after months of negotiation, the parties entered into the 2002 Claims Review Agreement ("CRA").

In October 2002, Mass Mutual suspended the 2002 CRA, and in December 2002, Mass Mutual terminated the 2002 CRA. ERC wanted another file review arrangement. Mass Mutual agreed to another file review arrangement as long as ERC used a vendor other than DMS. ERC agreed to use Disability Insurance Specialists ("DIS"), a vendor suggested by Mass Mutual, to continue the review of claims in 2003. Mass Mutual initially allowed DIS to review claims without a written agreement in place while the parties negotiated the terms of 2003 CRA. In September 2003, the parties entered into the 2003 CRA. The 2002 CRA and the 2003 CRA expressly state that the CRA "does not affect the contractual rights, duties and/or obligations of either party under their Reinsurance Agreement, nor limit any remedies available for either party." Both the 2002 CRA and the 2003 CRA state that "Mass Mutual shall be the final decision maker in all benefit determinations."

During visits to CML and Mass Mutual, ERC reviewed claim files and provided suggestions and recommendations to CML and Mass Mutual to assist in adjudication or

resolution of the claims, and help move the claims process forward.[3]

Pursuant to Article IX of the Treaty, Mass Mutual is required to provide "evidence of payment of loss" and is required to "give prompt notice to [ERC] of any event or development which...might result in a claim upon [ERC]." ERC generally received a monthly bordereau[4] from Mass Mutual, which described the payments Mass Mutual made on polices and the reserves established for each policy.

In 2004, Mass Mutual implemented a new reserve and claim administration system. For several months in the beginning of 2004, Mass Mutual did not request reimbursement from ERC. In February 2004, Mass Mutual discovered that it had miscalculated residual benefits under "AB policies." Mass Mutual conducted a manual and electronic review of the payment records for all AB claims with a disability date subsequent to October 1, 1986 and discovered that policy enhancements on some reinsured policies had not been paid. Mass Mutual then informed ERC that its portion of the benefit adjustment for the AB policies, which Mass Mutual had not previously billed ERC, amounted to $712,305.00. When calculating ERC's portion of the adjustment, Mass Mutual went back to the inception of the Treaty in 1993.

Subsequently, in the Spring of 2004, Mass Mutual informed ERC that it had discovered errors and inconsistencies with claims it had submitted to ERC for reimbursement from previous years–going back eleven years at that time, to the inception

---

[3] For example, ERC would recommend that an independent medical evaluation be performed, that surveillance be conducted, that tax returns or other financial information be obtained, or that a compromise resolution such as settlement be explored.

[4] A bordereau is an accounting document produced by Mass Mutual's finance department, in which Mass Mutual disclosed amounts it paid out on claims it represented as being covered under the Treaty.

Case 4:06-cv-00188-FJG   Document 310   Filed 08/19/08   Page 6 of 21

of the Treaty in 1993.  Several months later, in September 2004, Mass Mutual notified ERC that it had previously overcharged and undercharged ERC a net amount of $6 million–and that it was going to offset these amounts against current amounts owed.  Mass Mutual ended up offsetting the $6 million that it had previously overcharged ERC.

During the course of the 2003 CRA, ERC alleges it discovered serious breaches by Mass Mutual.  In December 2005, ERC presented twelve claims to Mass Mutual, which it claims Mass Mutual improperly submitted to ERC for reimbursement, or failed to investigate, settle, or defend.  ERC sought reimbursement from Mass Mutual on these twelve claims.  On January 20, 2006, Mass Mutual informed ERC that it would not reimburse ERC for those twelve claims because ERC was required to "follow-the-fortunes."  ERC claims this is the first time it heard from Mass Mutual that ERC was required to "follow-the-fortunes" under the Treaty.  ERC soon after filed suit against Mass Mutual on March 2, 2006.  Both parties have moved for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  The facts and inferences are viewed in the light most favorable to the nonmoving party.  Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986).  The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law.  Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth facts

7

showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

## III.   DISCUSSION

In granting plaintiff's motion to dismiss defendant's counterclaims II, III, and V, the Court previously determined on April 2, 2007 that Connecticut law applies to interpretation of the Treaty (Doc. No. 73). Thus, the Court will apply Connecticut law to the issues at hand. The issues presented by the dispositive motions filed in this matter are the following: (1) whether ERC's claims are barred by waiver, estoppel, or Connecticut's six-year statute of limitations; (2) whether the statute of limitations was tolled by the parties' course of conduct; (3) whether the Treaty at issue contains a "follow-the- settlements" provision; (4) whether "follow-the-settlements" is an industry custom or practice in the reinsurance industry; (5) whether the Treaty's offset provision was intended by the parties to offset

amounts that are in dispute; (6) whether ERC breached the contract when it stopped reimbursing Mass Mutual for all claims pursuant to the Treaty's offset provision; and (7) whether Mass Mutual has presented more than a simple breach of contract claim in order to maintain an action under the Connecticut Unfair Trade Practices Act against ERC. The Court will consider these issues below.

A. **Employers Reinsurance Corporation's Motion for Partial Summary Judgment (Doc. No. 191) and Massachusetts Mutual Insurance Company's Motion for Partial Summary Judgment (Doc. No. 202)**

The central issue in this case is whether ERC was required to follow-the-settlements of Mass Mutual under the Treaty. Both parties are seeking summary judgment on this issue. ERC seeks a declaration from the Court that (1) the Treaty does not contain an express follow-the-settlements provision; (2) a follow-the-settlements is not implied in the Treaty; (3) follow-the-settlements is not a custom and practice in the industry; and (4) ERC is not obligated under the Treaty to follow-the-settlements of Mass Mutual.

Follow-the-fortunes/follow-the-settlements is a widely recognized doctrine in the insurance industry. The phrases "follow -the-fortunes" and "follow-the-settlements" are used interchangeably. Both doctrines are related. "The follow-the-fortunes doctrine binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage tactics, lawsuits, compromise, resistance or capitulation." The North River Ins. Co. v. Ace American Reins. Co. (2d Cir. 2004) 361 F.3d 134, 139-40 (quoting British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 85 (2d Cir. 2003)). The related doctrine of "follow-the-settlements" refers specifically to the duty of the reinsurer to follow the actions of the reinsured in adjusting and settling claims. Aetna Cas. and Sur. Co. v. Home Ins. Co., 882 F. Supp. 1328, 1346, fn. 9 (S.D.N.Y. 1995). In short, these doctrines state that Mass

Case 4:06-cv-00188-FJG   Document 310   Filed 08/19/08   Page 9 of 21

Mutual's decisions on all the covered claims under the Treaty is binding on ERC as the reinsurer.

If follow-the-settlements applies to the Treaty at hand, then the liability determinations made by Mass Mutual cannot be challenged unless they are fraudulent or made in bad faith. <u>Christiania General Ins. Corp. of New York v. Great American Ins. Co.</u>, 979 F.2d 268, 280 (2d Cir. 1992). However, even if follow-the-settlements applies, the reinsurer still retains the right to question whether the reinsured's liability stems for an unreinsured loss. <u>Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am.</u>, 419 F.3d 181, (2d Cir. 2005)(citing <u>Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.</u>, 903 F.2d 910, 912 (2d Cir.1990)) (noting that "follow-the-fortunes" only "burdens the reinsurer with those risks [covered by] the direct insurer's policy covering the original insured"). Thus, "the reinsurer retains the right to question whether the reinsured's liability stems from an unreinsured loss." <u>North River Ins. Co. v. CIGNA Reinsurance Co.</u>, 52 F.3d 1194, 1199-1200. A loss is unreinsured "if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance." <u>Id.</u> at 1200. In other words, even if follow the settlements applies, ERC may question whether the claims it paid were covered under the Treaty.

ERC argues that the Treaty contains no such follow-the-settlements language and that typical follow the settlements language states that "when an insurer loses to – or settles with – the insured, the reinsurer must 'follow-the-fortunes' of the ceding company and pay on its reinsurance obligations." <u>Am. Bankers Ins. Co. v. N.W. Nat'l Ins. Co.</u>, 198 F.3d 1332, 1335 (11th Cir. 1999); <u>see also State Auto Mut. Ins. Co. v. Am. Re-insurance Co.</u>, 748 F. Supp. 556, 560 n. 5 (S.D. Ohio 1990)("Typically the clause will read, 'all claims involving this reinsurance, when settled by the company, shall be binding on the

reinsurer.'"); <u>Am. Ins. Co. v. N. Am. Co. for Prop & Cas. Ins.</u>, 697 F.2d 79, 81 (2d Cir. 1982)(All claims involving this reinsurance, when settled by the [ceding] company, shall be binding on the reinsurer.").

According to Mass Mutual, the Treaty undoubtedly contains a follow-the-settlements provision. Mass Mutual asserts that the language in Article IX that requires Mass Mutual to cause claims to be investigated, settled, paid, or defended constitutes a follow-the-settlements clause when read together with a provision in Article II that ERC indemnifies Mass Mutual for losses sustained under the Treaty. Mass Mutual also relies on the definition of loss found under Article IV of the Treaty which is defined as "amounts as are actually paid by the Reinsured for disability benefits afforded under the policies, in settlement of claims for disability benefits afforded under the policies, in settlement of claims for disability benefits under the policies, or in satisfaction of judgments for disability benefits under the policies." Mass Mutual further notes that both the 2002 and 2003 CRA state it is the final decision-maker in all benefit determinations even though ERC may participate in the claims review process.

Article IX of the Treaty provides:

CLAIMS. The Reinsured agrees that it will cause to be investigated, paid, settled, or defended all claims arising under the policies and that it will give prompt notice to the Corporation of any event or development which, in the judgment of the Reinsured, might result in a claim upon the Corporation hereunder, and will forward promptly to the Corporation copies of such claim documentation as may be requested by the Corporation.

The Corporation shall reimburse the Reinsured or its legal representative promptly for loss against which indemnity is herein provided, upon receipt in the home office of the Corporation of satisfactory evidence of payment of such loss.

The Corporation shall have the right, at its own expense, to participate jointly with the Reinsured in the investigation, adjustment or defense of any claim which, in the judgment of the Corporation, it is or might become exposed.

11

Article II provides in relevant part "As respects loss pertaining to each person as a result of each disability regardless of the number of policies involved, the Reinsured shall retain as its own net retention under this agreement the part thereof indicated in Schedule Item 5, and the Corporation will indemnify the Reinsured against the part of such loss indicated in Schedule Item 6."

Upon review of the parties' briefs, the Treaty, all exhibits, and the transcript of the summary judgment hearing held in this matter, the Court has concluded that based upon the four corners of the contract, the Treaty contains a follow-the-settlements provision. Although there is conflicting testimony from the parties' experts in this case on whether Article IX constitutes a follow the settlements provision, the Court finds that the Treaty is unambiguous on this point and extrinsic evidence is unnecessary to interpret the Treaty or to resolve conflicting industry custom and practice. See Seiden Assoc., Inc. v. ANC Holdings, 959 F.2d 425, 428 (2d Cir. 1992)(stating that the proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment); see also Omni Quartz v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2001)("a party is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing or in order to increase [a party's] obligations where those obligations were explicitly outlined in the contract itself.")(internal quotations and citations omitted).

This is an unambiguous automatic reinsurance Treaty which explicitly laid out the obligations of the parties. Article IX clearly states that "The Corporation [ERC] shall reimburse the Reinsured or its legal representative promptly for loss against which indemnity is herein provided." Nowhere in the Treaty does it state that ERC may question claims once those losses are incurred and paid. ERC's right of joint participation under the

Case 4:06-cv-00188-FJG   Document 310   Filed 08/19/08   Page 12 of 21

Treaty does not negate ERC's obligation to promptly pay claims. In addition, both the Treaty and the 2002 and 2003 Claims Review Agreements made Mass Mutual the final judge and arbiter of claims. Under Article IX, Mass Mutual is required to provide prompt notice to ERC of claims. However, such notice is subject to the judgment of the Reinsured (Mass Mutual). Moreover, both the 2002 CRA and the 2003 CRA state "that Mass Mutual shall be the final decision maker in all benefit determinations."

Further, ERC was the drafter of this Treaty and as a sophisticated party, it could have included language stating that it would not follow the settlement decisions of Mass Mutual instead of relying on its perceived belief about industry custom and practice. See Unigard Security Ins. Co., Inc. v. North River Insurance Company, 4 F.3d 1049, 1064-65 (2d. Cir. 1993)(stating that reinsurance contracts are negotiated at arm's length by two sophisticated parties). ERC chose not to include such language and now it wishes to question over 130 claims that it was obligated to pay under the Treaty. ERC and Mass Mutual are two sophisticated parties who have long engaged in business with one another and if one party wishes to terminate the contract or negotiate the terms of the contract, they are free to do so. In fact, as soon as Mass Mutual took over the block of business from CML, ERC was put on notice that Mass Mutual had a different philosophy with regard to claims handling but ERC maintained this relationship for the next ten years. David Newkirk, who is a former ERC employee and was Claims Counsel, testified at the hearing that ERC knew about Mass Mutual's different philosophy in handling claims when the merger occurred:

> The Court: So you're saying ERC had this belief as early as '96?
>
> Newirk: We had one set of beliefs with Mass Mutual as to what their philosophy was. We continued –our beliefs were constant as to what our rights were. Mass Mutual had a different philosophy when the Mass Mutual

merger occurred.

The Court: But you knew that as early as '96 when that merger occurred?

Newkirk: We knew that their philosophy was changing. We continued to try to influence it. We had a number of meetings with them where we were told that they would be more receptive to our beliefs. And those occurred over a variety of years.

(See Hearing Transcript, pp.66-67; p. 66, l. 22-25; p. 67, l.1-10.)

Finally, the Court finds that the parties' course of conduct for the past thirteen years supports the interpretation of the Treaty that ERC followed the settlement and claims decisions of Mass Mutual. Evidence of course of conduct can be considered to interpret the meaning of a contract. See Scapa Tapes North America, Inc. v. Avery Dennison Corp., 384 F. Supp. 2d 544, 550 (D. Conn. 2005)(citing Putnam Park Assocs. v. Fahenstock & Co., 73 Conn. App. 1, 10 (Conn. App. 2002). The parol evidence rule forbids the presentation of evidence outside the four corners of the contract to vary or contradict the written terms of an integrated contract, see One Sylvan Rd. North Assocs. v. Lark Int'l, 1997 Conn. Super. LEXIS 3513, *33-34 (Conn. Super. Dec. 30 1997) (internal citations omitted), but it can be used to add a missing term or explain an ambiguity in the document, see Heyman Assoc. No. 1 v. Insurance Co. of Pennsylvania, 231 Conn., 231 Conn. 756, 780 (1995). Even if the claims provision under Article IX can be interpreted as ambiguous, the parties' course of conduct helps to explain any remaining ambiguity. It was not until December 2005 that ERC questioned particular claims that Mass Mutual had handled. Indeed, there were issues between the parties as to ERC's right of joint participation under the Treaty which led to the formation of the 2002 and 2003 CRA's, but ERC did not refuse to pay any claims during this time. Rather, ERC consistently and continually paid out claims to Mass Mutual for thirteen years. The course of conduct between the parties does

not contradict the terms of the agreement. In fact, the parties' course of conduct only confirms the conclusion that ERC followed the settlements of Mass Mutual. Indeed, "where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) of Contracts § 202 (4)(1979).

Because the Court has concluded that the Treaty contains an express follow-the-settlements provision, it is unnecessary to consider industry custom and practice. In addition, since it is the Court's determination that the follow-the-settlements doctrine applies to the Treaty, ERC may not question the claims handling practices of Mass Mutual. ERC may only now question those claims that are not covered under the Treaty or that were made in bad faith. See North River Ins. Co. v. ACE American Reinsurance Co., 361 F.3d 134, 139 (2d Cir. 2004)("follow -the- fortunes applies only to claims submitted in good faith"). Therefore, the Court hereby **DENIES in PART** Employers Reinsurance Corporation's Motion for Partial Summary Judgment (Doc. No. 191) and **GRANTS** Massachusetts Mutual Insurance Company's Motion for Partial Summary Judgment (Doc. No. 202).

### B. Defendant's Motion for Summary Judgment Based Upon Limitations/Waiver/Estoppel/Latches on Plaintiff's Complaint (Doc. No. 193)

Mass Mutual argues that ERC's claims are barred based upon one or more of the following: (1) Connecticut's statute of limitations, (2) doctrine of waiver, (3) the doctrine of estoppel; or (4) the doctrine of latches.

The Court concludes that in light of the Court's decision above, Mass Mutual's argument that ERC's claims are barred by estoppel, waiver, and Connecticut's six-year

statute of limitations is moot. It is irrelevant exactly when ERC first knew of the breaches of the Treaty because ERC is required to follow-the-settlements of Mass Mutual. Given the Court's ruling that the follow-the-settlements doctrine applies to the Treaty, ERC now cannot challenge the 130 claims it sought to challenge. Thus, the application of follow-the-settlements serves to bar many or all of ERC's claims. Therefore, the Court hereby **DENIES AS MOOT** Defendant's Motion for Summary Judgment Based Upon Limitations/Waiver/Estoppel/Latches on Plaintiff's Complaint (Doc. No. 193).

> ### C. Defendant's Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment on Count I of its Counterclaim (Doc. No. 188)

ERC stopped reimbursing Mass Mutual for claims under the Treaty in April 2006 and has recently begun making payments in July 2008. Pursuant to the Treaty, ERC states it withheld reimbursements to Mass Mutual to offset damages that it has incurred due to Mass Mutual's breach of the Treaty. However, Mass Mutual claims ERC breached the Treaty by improperly offsetting its damages which are in dispute. ERC is relying on the following provision to "offset" its damages under the Treaty. Article XII of the Treaty provides as follows:

> <u>OFFSET</u>. The ...Corporation may offset any balance, whether on account of premiums, commissions, loss or claim expenses due from one party to the other under this agreement or under any other reinsurance agreement heretofore or hereafter entered into between the Reinsured and the Corporation, whether acting as assuming reinsurer or ceding company.

Mass Mutual claims that withholding monies under the offset provision for disputed claims does not fall within the offset provision. Mass Mutual contends that when a party offsets an amount under the Treaty, it is a known number for a specific reason, such as accounting or clerical error.

Not surprisingly, ERC responds that the Treaty permits offset in this situation. ERC

argues that the offset provision is unambiguous. ERC states that the Treaty does not limit the offset rights and allows either party to offset any balance. Additionally, ERC claims that Mass Mutual previously exercised its contractual right of offset when it discovered that it improperly overcharged ERC $6 million, so Mass Mutual offset $6 million against future amounts.[5]

The Court finds that ERC has violated the Treaty's offset provision by offsetting disputed damages under the Treaty. The Treaty's offset provision states that the parties may offset loss or claim expenses **due** from one party to the other under the Treaty. However, whether ERC is owed monies for claims it previously paid is in dispute. It is not unequivocal that money is owing and due to ERC. Thus, when ERC offset its damages that were in dispute, it violated the offset provision under the Treaty. Again, the parties' course of conduct in this case supports the conclusion that the parties would utilize the offset provision when the loss or damages were **agreed** upon. ERC itself referred to situations where Mass Mutual overcharged ERC, but the parties agreed on the amount of the offset and nothing was in dispute. If the offset provision were intended to be used by either party whenever the party believed it was owed money, then the offset provision could be used anytime an amount was in dispute and the subject of litigation. Nowhere does the Treaty provide that if ERC subsequently disagrees with the investigation, payment or settlement of a claim, then it can offset the corresponding payments against future losses. Therefore, because the Court finds that ERC violated the offset provision when it took an offset for damages that were in dispute, the Court hereby **GRANTS** Defendant's

---

[5]As of November 1, 2007, ERC states that it has offset $24,006,503 and maintains the amounts it has offset in a separate account pending resolution of this litigation. ERC estimates that its damages are in excess of $37 million.

17

Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment on Count I of its Counterclaim (Doc. No. 188).

### C. ERC's Summary judgment on Count VII of Mass Mutual's Amended Counterclaim (Doc. No. 191)

ERC seeks summary judgment on Count VII of Mass Mutual's Amended Counterclaim which asserts a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). ERC argues that the conduct complained of—ERC's exercise of its contractual right of offset–is nothing more than a breach of contract claim, which is not viable under CUTPA.

Under CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110(b)(a). Relief under CUTPA is accorded to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice..." Conn. Gen. Stat. § 42-110(g)(a). The purpose of CUTPA is to protect consumers, competitors, and businesses. See Salmon Bros. Realty Corp. v. Yost, 2001 Conn. Super. LEXIS 2777, 2001 WL 1232054 at *2 (Conn. Super. Sept. 26, 2001). To determine whether an act is "unfair" under CUTPA, Connecticut courts have adopted the "cigarette rule" developed by the Federal Trade Commission, under which a court must consider three factors:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspeople].

Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1038-39 (2d Cir. 1995)(quoting

Atlantic Richfield Co. v. Canaan Oil Co., 520 A.2d 1008, 1012 (Conn. 1987))(alterations in original).

ERC argues that even if it breached the Treaty, a breach of contract claim is not an unfair act or practice under CUTPA and is not sufficient to violate CUTPA. ERC states that "substantial aggravating circumstances" are required before a contract claim can amount to a CUTPA violation. City of Bridgeport v. Aerialscope, Inc., 122 F. Supp. 2d 275, 278 (D. Conn. 2000).

The Court agrees with ERC that Mass Mutual has failed to allege any facts or evidence which demonstrate "substantial aggravating circumstances." A simple breach of contract claim is not in and of itself a violation of CUTPA. See Pape v. Goldbach, 1999 Conn. Super. LEXIS 3488, *6-7 (Dec. 28, 1999) (citing Emlee Equipment Leasing Corporation v. Waterbury Transmission, Inc., 41 Conn. Supp. 575, 580, 595 A.2d 951, 3 CONN. L. RPTR. 711 (1991); Lanese v. Mecca, 1995 Conn. Super LEXIS 343 (Feb. 6, 1995)). Mass Mutual's primary claim is that ERC breached the Treaty by refusing to reimburse Mass Mutual for claims. The Court finds that this breach does not offend public policy. Mass Mutual was required to show that ERC engaged in some conduct that was more offensive than not reimbursing Mass Mutual for claims under the Treaty. The Court finds that Mass Mutual failed to meet that burden. Therefore, the Court hereby **GRANTS** summary judgment in favor of ERC on Count VII of Mass Mutual's Amended Counterclaim.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, Defendant's Massachusetts Mutual Life Insurance Company's Motion for Summary Judgment on Count I of its Counterclaim (Doc. No. 188) is **GRANTED**; Employers Reinsurance Corporation's Motion for Partial Summary Judgment (Doc. No. 191) is **DENIED IN PART, GRANTED IN PART**; Defendant's Motion

for Summary Judgment Based Upon Limitations/Waiver/Estoppel/Latches on Plaintiff's Complaint (Doc. No. 193) is **DENIED AS MOOT**; and Massachusetts Mutual Insurance Company's Motion for Partial Summary Judgment is **GRANTED** (Doc. No. 202). Therefore, summary judgment is granted in favor of defendant/counter claimant Mass Mutual on Count I and Count IV of its counterclaim; summary judgment is granted in favor of plaintiff/counter defendant ERC on Count VII of Mass Mutual's counterclaim; and partial summary judgment is granted in favor of Mass Mutual as to Count I of ERC's Complaint.

Additionally, because the Court ruled on evidentiary matters from the bench at the summary judgment hearing, the following motions are hereby **DENIED AS MOOT:** Defendant's Motion in Limine to Preclude Certain Testimony at the Hearing (Doc. No. 297) and Plaintiff's Motion to Strike Defendant's Motion in Limine (Doc. No. 300). Further, the Court based its decision on the briefs, exhibits, and evidentiary hearing held. Thus, the Court hereby **DENIES** all motions to strike the pre-hearing briefs: Plaintiff's Motion to strike Defendant's Pre-Hearing Brief (Doc. No. 299); Defendant's Motion to Strike Portions of Plaintiff's Brief (Doc. No. 307); and Defendant's Amended Motion to Strike Portions of Plaintiff's Brief (Doc. No. 308).

Further, the following motions were also provisionally denied pending the hearing: Defendant's Motion to Exclude Certain Testimony of Expert Hodsoll (Doc. No. 196); Defendant's Motion to Strike Expert Testimony of Expert Hall (Doc. No. 200); Employers Reinsurance Corporation's Motion to Exclude Testimony of Massachusetts Mutual Life Insurance Company's Designated Experts (Doc. No. 198); Defendant's Motion to Strike Second Supplement Expert Report of Bruce Hodsoll (Doc. No. 271); Plaintiff's Motions in Limine (Doc. No. 255); and Defendant's Motion in Limine (Doc. No. 261). In light of the Court's ruling on the application of the follow-the-settlements doctrine to this case and

ERC's violation of the offset provision, the parties may wish to file any expert affidavits and motions in limine based upon the Court's ruling on these legal issues.  If the parties choose to file any motions in limine or expert affidavits, these motions should be filed no later than **Friday, September 15, 2008**.

       **IT IS SO ORDERED.**

Date:  8/19/08                           **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri               Fernando J. Gaitan, Jr.
                                     Chief United States District Judge